UNITED STATES *v.* UNIVERSITY OF CHICAGO PRESS (No. 3864)[1]

[1] T. D. 47736.

United States Court of Customs and Patent Appeals, May 27, 1935

*Joseph R. Jackson*, Assistant Attorney General (*Ralph Folks*, special attorney of counsel), for the United States.

*James R. Ryan* for appellee.

[Oral argument April 15, 1935, by Mr. Jackson and Mr. Ryan]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court.

Merchandise, consisting of books of foreign authorship, was assessed for duty by the collector at the port of Chicago at 15 per centum ad valorem under paragraph 1410, Tariff Act of 1930.

The importer protested, claiming the merchandise to be free of duty as books printed "wholly or chiefly in languages other than English", under paragraph 1630 of that act.

So far as pertinent, the competing paragraphs read as follows:

PAR. 1410. Unbound books of all kinds, bound books of all kinds except those bound wholly or in part in leather, sheets or printed pages of books bound wholly or in part in leather, pamphlets, music in books or sheets, and printed matter, all the foregoing not specially provided for, if of bona fide foreign authorship, 15 per centum ad valorem; * * *.

PAR. 1630. Books and pamphlets printed wholly or chiefly in languages other than English; books, pamphlets, and music, in raised print, used exclusively by or for the blind; Braille tablets, cubarithms, special apparatus and objects serving to teach the blind, including printing apparatus, machines, presses, and types for the use and benefit of the blind exclusively.

On the trial below, appellee offered in evidence Exhibit 1, a book entitled—

A Dictionary of the Older Scottish Tongue, from the twelfth century to the end of the seventeenth, By Sir William A. Craigie, LL. D., D. Litt., Professor of English in the University of Chicago and Co-editor of the Oxford English Dictionary,

as representative of the importation.

But one witness, George Marr Watson, research assistant, and instructor in lexicography and English in the University of Chicago, was called by appellee. He stated that he had had experience as a lexicographer from 1907 to 1927 "on the Oxford English Dictionary"; that he had been compiling dictionary records in the University of Chicago; that he was familar with Exhibit 1, which he identified for

the purpose of the record; that he had "supplied the language" of his "native tongue"—"Scottish"—used in the exhibit, and could read most of it, but had not done so; that the Scottish language is a variety of the "old North Umbrian English tongue"; and that Exhibit 1 was printed in more than one language—Modern English and "Old Scottish."

The witness further stated that his native language was Modern Scottish; that, by reading and studying over a period of years, he had become familiar with the Ancient Scottish language; that Exhibit 1 was composed of "ancient Scottish," and "modern English," languages; that the two languages differ in "vocabularies, phonetics, and in grammar"; that the books contained about 88 per centum Old Scottish, and about 12 per centum Modern English words; that he had determined such percentage by "counting the lines of several pages taken at random"; that, as heretofore stated, he had not read the book, but had "scanned through most of it"; that Exhibit 1 was used for scholarship purposes; that, although authorities differed upon the subject, he did not agree that the Old Scottish language was a dialect of English; that the Old Scottish language was a "development of old North Umbrian, which was a variety of English"; that there were several dialects of the English language, including "Lincolnshire," "Somerset," and "Cornwall"; and that "you may have a different dialect in each county but there are major divisions, North Umbrian, Midland, South Western, Eastern, Kentish."

We quote from the testimony of the witness:

X Q. And you say this old Scottish is also a dialect of English?—A. No; I do not agree with that.

X Q. Some people do call it a dialect of the English tongue; is that right?—A. Some people do. I do not say so. This covers a period when Scotland was a different kingdom, when it had no king of its own.

X Q. I believe you said this old Scottish language is a development of old North Umbrian.—A. Old North Umbrian was used about 800 years ago. This was a variety of it.

X Q. It was a variety of the English language?—A. I do not agree. Old North Umbrian, as I said before—

X Q. Was that English?—A. It was a collateral branch of English.

X Q. Old North Umbrian, was that English?—A. No; it was a collateral branch of English.

X Q. It was a dialect of English?—A. It was a collateral branch of it.

X Q. You divide the English language into different branches?—A. Certainly.

X Q. This old Scottish tongue is a branch of the English language; is that right?—A. Of old North Umbrian.

X Q. The old Scottish tongue is not a branch of the English language?—A. It is a branch of old North Umbrian, I say, which was a collateral branch of early English.

X Q. A collateral branch of early English; so that it was a certain kind of English?—A. It was not so-called.

X Q. It was called—A. North Umbrian.

X Q. Was that language distinct and apart from English?—A. Apart from English; yes.

\* \* \* \* \* \* \*

R. D. Q. Old Scottish is no closer akin to modern English than Latin is to modern French, Italian, and Spanish?—A. They are separate.

On this record, the court below, in an opinion by Tilson, P. J., Dallinger, J., dissenting, held that the books in question were printed chiefly in a language other than English, within the meaning of paragraph 1630, *supra*. In its decision, the court quoted the following, which, it stated, it had selected at random from Exhibit 1 as being fairly illustrative of the contents of the books:

Awnar, Awner, *n.* Also: Aunar,-er (aunder), avnar; awanar, awinar; anar, aner. [ME. *awener, ownere, ouner, ozenere* (1340), f. *ozenen*, OE. áznian, áhnian, to own, possess.]

1. An owner or possessor. (Common in 16th c.)

(*a*) That the . . landis forsaid be deliuerit to the awnaris; 1488 *Acts* II. 207. The saidis officeris sall . . deliuer the samin clippit money agane to the awnar; 1493 *Ib.* 233/2. To rest the avnaris of the Cukow to the court; 1496 *Treas. Acc.* I. 302. Every porcioner, or awanar of the samyn, to mak his dikis sufficient; 1514 *Aberd. B. Rec.* I. 91. His factouris, aunaris, skipparis or marinellis of the sade schippis; 1515 *Reg. Privy S.* I. 400/1. The residew of the saidis gudis, quhilkis had na Iuste awnaris, war sald; Bell. *Livy* I. 256/3. Gif the awnaris lattis the ground to be vnbiggit; 1555 *Acts* II. 490/1. Vnder the pane of warding of the awnaris of the gudis; 1572 *Peebles B. Rec.* 352. The awnaris, proprietaris, and titularis of the salmound fischingis of this burgh; 1605 *Aberd. Eccl. Rec.* 51. Ane beist beand gangand waif or vyld, salbe gevin to the awnare; Bisset I. 43/33.

(*b*) Quhilk bawks the awneris . . tuke and put in the ground; 1554 *Edinb. B. Rec.* II. 309. Sindry maisteris, skipparis, . . and awneris of schippis; 1555 *Ib.* 227. The lawfull and trew cunzie . . to be . . delyuerit agane to the awner; *Diurn. Occurr. 345.* The awner of the saidis [salt] pannis; 1578 *Conv. Burghs* I. 64. To incarcerat and waird the awneris and boitmen thairof; 1600 *Ib.* II. 82. William Rankein . . just auner therof; 1606 *Melrose R. Rec.* I. 15. That the maister of the ground . . caus restore the goods to the awners; 1635 *Grant Chart.* 340. On blanket . . quhilk was givin bake to the just aunder; c 1653 *Irvine Mun.* II. 253. The . . auner of the said beist; 1674 *Melrose R. Rec.* II. 377.

(*c*) Paytt to the aneris . . for ilk leyd or buirdyng takyne awa; 1509 *Rec. Earld. Orkney* 83. Everie anar of the land; 1552 *Reg. Privy C.* I. 130. The aner of the said beist sall pay . . ane firlott of aittis; 1584 *Prot. Bk. J. Scott* 208.

The court commented on the fact that the Government presented no evidence, and concluded that it was not permitted to use its expert knowledge upon the subject, but that the issues should be determined upon the evidence of record.

In his dissenting opinion, Judge Dallinger stated that Exhibit 1 consisted of—

\* \* \* a series of words belonging to this North . Umbrian dialect arranged in alphabetical order, each word being followed by its definition in modern English, and by illustrative quotation from ancient authors. Many of the dialect words are spelled and pronounced like corresponding modern English words of similar meaning.

Taking the book as a whole the majority of the words, in my opinion, are in intelligible English capable of being read and understood by the average American reader who is willing to exercise a little patience.

In the majority opinion there is quoted an extract from page 160 as "a fair illustration of the contents of the book in controversy." Admitting for the sake of argument that the passage in question is fairly representative of the whole, which I seriously question, nevertheless, in my opinion a majority of the words appearing therein, excluding of course all reference to abbreviated names of the authorities cited, is as understandable to the average American reader as would be a corresponding passage from the original editions of "Spencer's Fairy Queen", or "Chaucer's Canterbury Tales", or of some of the early authorities on the English common law, all of which works are universally recognized as classics of the English language.

Judge Dallinger was also of opinion that paragraph 1630, *supra*, was not limited to Modern English, but included so-called Old and Middle English as well, and that, therefore, the involved books were not printed chiefly in languages other than English, but were dutiable as assessed by the collector.

The Government here contends that the involved merchandise, of which Exhibit 1 is representative, is, in accordance with the views of the great weight of authority, printed chiefly in the English language, and, in its brief, quoted from Webster's New International Dictionary, Encyclopedia Britannica, and the New International Encyclopedia in support of its contention.

Counsel for appellee, on the contrary, argues that the Old Scottish language is not English; that such facts are established by the only evidence of record; that this court is limited to such evidence; and that, therefore, the judgment should be affirmed.

We may say at the outset, without any intended criticism of the witness, or of his qualifications, that he did not refer to a single authority, nor have we found any, in support of his testimony, which consisted of expressions of opinion only.

The witness stated that the language of the people of Northumbria, from the twelfth to the seventeenth century, was a "collateral branch" of English, and that the old Scottish language was a "branch" of "old North Umbrian."

Just what the witness meant by "collateral branch" was not explained, nor did he explain what he meant by the statement, hereinbefore quoted, that the Old Scottish language was a development of the Old Northumbrian language. Modern English, of course, is but a development of the Old English language.

It may be observed that, in an effort to establish that the involved books were printed chiefly in languages other than English, appellee relied upon Exhibit 1, and the statement of the witness that he estimated that the book contained about 88 per centum Old Scottish words, as compared with about 12 per centum English words, which estimation was made by "counting the lines of several pages taken

at random," and by scanning through most of the book. Such evidence is far from satisfactory.

The courts, of course, have a right to take judicial knowledge of the development of the English language, and, for information, need but turn to the many authorities upon the subject. This being so, the court is not bound by the testimony of the witness, but may consider it as an aid in reaching a proper conclusion.

It may be observed that the word "English," contained in paragraph 1630, *supra*, which paragraph provides for free entry of books printed wholly or chiefly in languages other than English, is not limited to Modern English. In the absence of words of limitation, the word "English" must have been intended to include so-called Middle and Old English as well. We deem it unnecessary to cite authorities in support of that proposition.

No doubt, many English scholars, who can read Latin, German, and other foreign languages fluently, may find it difficult, or even impossible, to read Old English fluently. However, that fact is not decisive of the question at issue.

As was observed by Judge Dallinger, in his dissenting opinion, there are many English speaking people who would have difficulty in reading the works of Chaucer, whose writings, as is well known, had a profound influence upon the literature of Scotland during and subsequent to the fourteenth century.

Relative to the language spoken by the people of Scotland from the twelfth to the seventeenth century, we quote the following:

English. * * * The English language has been variously divided into periods by different writers. In the division now most commonly recognized, and adopted in this book, the first period dates from about 450 to 1150. This is the period of full inflection, and is called *Anglo-Saxon*, or, by many recent writers, *Old English*. The second period dates from about 1150 to 1550, and is usually called *Middle English*, or by some *Old English*. During this period most of the inflections were dropped, there was a great addition of French words to the language, and orthography became comparatively fixed. The last period, from about 1550, is called *Modern English*. Some make four main divisions: *Anglo-Saxon* as above; *Old English*, from about 1150 to 1350; *Middle English*, from about 1350 to 1550; and *Modern English* as above. * * * The terms *Old English, Early English*, are indefinitely applied in popular use, the first to any obsolete form of the language, the latter either to early *Middle English* or to the earlier portion of the *Modern English* period.

The famous Beowulf, according to some the first on the beadroll of substantive and noteworthy poems in *English*, using that word in the most elastic sense. *Saintsbury*.

Northumbrian. Of or pert. to Northumberland in England, or the Anglian kingdom of Northumbria, which comprised eastern England and Scotland between the rivers Humber and Forth, and was the foremost of the Anglo-Saxon powers from about 500 to 750. * * * b The Anglo-Saxon dialect spoken in Northumbria * * *; also, the modern English dialect of Northumberland

(Webster's New International Dictionary.)

### EARLY DIVISIONS OF ENGLISH

DIALECTICAL DIFFERENCES.—The different Germanic tribes which gradually overran Britain spoke, already in their ancient homes, dialects which were to some extent differentiated, and doubtless these differences were enhanced by the circumstances of political and geographical separation incidental to the settlement of a country of the size and physical character of Britain. But the dialectal differences of the Old English period do not amount to much. These differences consist chiefly in a slightly various development of the original West Germanic vowel system. This variety was rich in potentialities of later differences rather than important in the 10th and earlier centuries. It could certainly have formed no bar to social intercourse. The old records enable us to distinguish four main dialectal types—the Northumbrian; Mercian; Kentish; Saxon.
(Encyclopedia Britannica, 14 Ed. Vol. 8, p. 555.)

### SCOTTISH LITERATURE

"Scottish Literature" is taken here in the familiar sense of the Teutonic vernacular of Scotland, not in the more comprehensive sense of the literature of Scotland or of writings by men of Scottish birth, whether in Gaelic (see CELT) or Latin or Northern English. The difference between the two definitions, however, is of small practical concern. The Scottish-Gaelic literature, which is separately dealt with (see CELT: *Literature*) is, by comparison, of minor importance;

I. *Early Period* (from the beginnings to the earlier decades of the 15th century). The literary remains of this period written in the vernacular, which is in its main characteristics "Northern English," are in the familiar medieval kinds of romance and rhymed chronical. After the Wars of Independence a national or Scottish sentiment is discernible, but it does not color the literature of this age as it does that of later periods when political and social conditions had suffered serious change.

II. *Middle Period* (extending, roughly, throughout the 15th and 16th centuries). * * *
The prevailing influence in the writers of greater account is Chaucerian.
(Encyclopedia Britannica, 11th Ed. Vol. XXIV, p. 457. See also Encyclopedia Britannica, 14 Ed. Vol. 20, p. 183.)

ANGLO-SAXON LANGUAGE AND LITERATURE.—The term Anglo-Saxon is employed, in popular speech and to some extent among scholars, to designate the language of the Germanic peoples in England before the coming of the Normans (1066). Such, however, was not the usage of those who wrote in the language. Alfred, Aelfric, and others repeatedly called it *Englisc*, i. e., English. True, the expressions *Angli Saxones* and *Saxones Angli*, i. e., English Saxons, occur in medieval Latin literature, but they were used to distinguish the Saxons in England from those on the Continent. It was not until the revival of interest in England's earliest history and literature, which dates from Camden's *Britannia* (1586), that the compound "Anglo-Saxon" made its appearance, to denote, without any reference to their Continental kinsmen, the entire English people and their language. This designation was generally followed by historians and philologists down to 1875. Since then an increasing number of them have adopted the usage of King Alfred. To the earliest period in the history of the English language they have given the name Old English. The term Anglo-Saxon, it is argued, is misleading; for it seems to imply that our language before the Norman conquest was not English. It is, of course, admitted that the English language underwent great phonetic and inflectional changes in the twelfth and thirteenth centuries; and yet English has always remained English. On this continuity in the development of our speech, the proper emphasis is laid

by the term Old English. For this and other reasons, it has seemed best to treat the so-called Anglo-Saxon language and literature under ENGLISH LANGUAGE, and ENGLISH LITERATURE.
(New International Encyclopedia, Vol. I, p. 569.)

There may be differences of opinion as to the language spoken and written by the people of Scotland from the twelfth to the seventeenth century. It would seem strange indeed if that were not so. However, it is not the purpose of this opinion to attempt to speak authoritatively upon that subject. It is sufficient to say that in view of the testimony of record, the exhibit in evidence, and the recognized authorities upon the subject, hereinbefore referred to, we are of opinion that appellee failed to establish that the imported books were printed wholly or chiefly "in languages other than English," and that the court below erred in sustaining the protest.

For the reasons stated, the judgment is *reversed*.